**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| CHRIS WHINERY, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PREMIER FUNERAL MANAGEMENT | ) | Case No. CIV-20-130-D |
| GROUP IV, LLC, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRAD WHINERY and GLENDA WHINERY, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

## <u>ORDER</u>

Currently pending before the Court are four dispositive motions filed under Fed. R.

Civ. P. 56:  Plaintiff Chris Whinery's Motion for Summary Judgment [Doc. No. 63];

Defendant Premier Funeral Management Group IV, LLC's Motion for Summary Judgment

Against Plaintiff Chris Whinery [Doc. No. 64]; Defendant Premier Funeral Management

Group IV, LLC's Motion for Summary Judgment Against Counterclaim Defendants Brad

Whinery and Glenda Whinery [Doc. No. 65]; and Counterclaim Defendants Brad Whinery

and Glenda Whinery's Combined Motion for Summary Judgment [Doc. No. 66].  All these

Motions are fully briefed [Doc. Nos. 72 through 79], and because they share relevant facts

and common legal issues, the Motions are addressed together.[1]

---

[1] The separate motions of Premier Funeral Management Group IV, LLC are supported by identical statements of facts and exhibits [Doc. Nos. 64-1 through 64-30, and Doc. No. 67].

## Factual and Procedural Background

Plaintiff Chris Whinery was employed by Defendant Premier Funeral Management Group IV, LLC ("Premier") from the time it purchased his parents' funeral home business in October 2014 until Premier terminated his employment in December 2019. At the time of the purchase, Plaintiff signed a Noncompetition Agreement ("NCA") containing covenants not to compete with the business or engage in certain conduct. *See* Pl.'s Pet., Ex. A [Doc. No. 1-3].[2] After his termination, Plaintiff filed this declaratory judgment action in state court challenging the enforceability of his NCA. Premier timely removed the case to federal court based on diversity jurisdiction.

After filing its answer, Premier moved to enjoin Plaintiff from violating the NCA, and to enjoin Plaintiff's parents from violating a similar NCA, by operating a competing funeral service business in western Oklahoma. *See* Def.'s Mot. Prelim. Inj. [Doc. No. 7]. The motion was denied for lack of an underlying claim to support the requested remedy. *See* 5/15/20 Order [Doc. No. 16] at 3-4. Over Plaintiff's objection, Premier then amended its pleading to add counterclaims for breach of contract and tortious interference with contractual or business relations against Plaintiff and his parents, who were joined as counterclaim defendants. Premier did not renew its motion for injunctive relief. Instead,

---

[2] As discussed *infra*, this NCA is substantially identical to ones signed by other individuals in connection with the sale. The NCAs appear throughout the case record as exhibits to Plaintiff's pleading and multiple motions and briefs. *See* Pet., Ex. A [Doc. No. 1-3]; Pl.'s Mot. Summ. J., Ex. 1 [Doc. No. 63-1]; Premier's Resp. Br., Exs. 3, 6 [Doc. Nos. 73-3 and 73-6]; Premier's Mot. Summ. J. Against Chris Whinery, Exs. 5, 6 [Doc. Nos. 64-5 and 64-6]; Brad Whinery & Glenda Whinery's Mot. Summ. J., Ex. 6 [Doc. No. 66-6]; Premier's Resp. Br., Exs. 4, 5 [Doc. Nos. 75-4 and 75-5]. For ease of reference, the Court will refer to and cite these documents collectively as the "NCA" or "NCAs."

the parties proceeded under an agreed case schedule and timely filed the instant Motions seeking summary judgment in the movant's favor on all claims, except Premier has moved for judgment only on its breach of contract claim and not its tort claim.

## Standard of Decision

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable juror could return a verdict for either party. *Id*. at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id*.

A movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine dispute. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c)(1)-(2). "Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard, with each motion viewed in the light most favorable to its nonmoving party." *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

The inquiry is whether there is a need for a trial – "whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because

they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 251.

"The interpretation of an unambiguous contract is a question of law to be determined by

the court, and may be decided on summary judgment." *Pub. Serv. Co. v. Burlington N.*

*R.R. Co.*, 53 F.3d 1090, 1096 (10th Cir. 1995) (citations omitted).

### Statement of Undisputed Facts [3]

Plaintiff Chris Whinery and Counterclaim Defendants Brad Whinery and Glenda

Whinery are immediate family members; Chris is Brad and Glenda's adult son.[4]   The

Whinery family has been involved in the funeral services business in western Oklahoma

for decades, beginning with Brad's father, A.L. Whinery, in 1961.   Brad joined his father's

funeral home business in 1977.   In 1988, Brad and Glenda bought the business, which had

two locations, and gradually expanded it.   By 1999, Brad and Glenda owned and operated

five funeral homes – in Sayre, Cheyenne, Erick, Elk City, and Lawton – under a corporate

entity known as Whinery Funeral Service, Inc. ("WFS").[5]   In 2004, Chris began a third

generation in funeral services when he became a licensed funeral director.   He was

employed by WFS when his parents sold the business to Premier.

---

[3] This statement includes material facts that are properly supported in the manner required by Fed. R. Civ. P. 56(c)(1).  If a party has asserted a fact, or asserted that a fact is disputed, but has failed to provide such support, the assertion is disregarded.

[4] Because they share a common surname, the Court refers to the individuals by their first names.  When discussing joint positions or arguments, the Court refers to them collectively as the Whinerys.

[5] Two of the funeral homes were renamed to include the family name –the Savage Funeral Home in Elk City became "Whinery-Savage" in 1993 and the Huddleston Funeral Home in Lawton became "Whinery-Huddleston" in 1999.

On October 29, 2014, WFS entered into an asset purchase agreement with Premier dated August 29, 2014, which Brad executed as president of WFS.  In addition to the five funeral homes, WFS sold to Premier substantially all its assets and the goodwill of the business – including all customer lists, funeral records, business records, and transferable licenses and permits – and rights to use the name "Whinery Funeral Services" and similar names, for a purchase price of $5,150,000.00.  Under the terms of the purchase agreement, Brad, Glenda, Chris, and Carl Billey (another WFS funeral director) were each required to sign an NCA like the one on which Chris filed suit.  *See supra* note 1.  An itemization of the purchase price allocated $435,000.00 for goodwill and $750,000.00 for the covenants not to compete.  The purchase agreement provided that the $750,000.00 would be paid out quarterly over the twelve-year term of the noncompetition period, and similarly, each NCA provided for quarterly payments of consideration to the signatory over twelve years.

The NCAs are identical except for individual names and amounts of consideration.  Chris's NCA provided for consideration to him of $150,000.00; Brad and Glenda jointly signed an NCA that provided for consideration of $500,000.00.[6]  Chris, Brad, and Glenda signed their NCAs around the same day as the purchase agreement in October 2014.  The NCAs contain a covenant not to compete that is comprised of several provisions, and an exclusion printed in all-capital letters.  Because the language of these provisions is critical

---

[6] Brad testified that despite the terms of the NCA, his and Glenda's consideration included $125,000.00 payable to another individual who also provided an NCA (Jim Bremer) so their net consideration was $375,000.00.  This difference is not material.  Also, Mr. Billey's NCA, which provided for consideration of $100,000.00, is "not at issue in this litigation."  *See* Premier's Mot. Summ. J. Against Chris Whinery, at 3-4 n.1; Premier's Mot. Summ. J. Against Brad and Glenda Whinery, at 4 n.2.

to the issues presented, they will be quoted in the discussion below. Generally, the covenant proscribed certain activities within a 50-mile radius of the five business locations for a twelve-year term, but the exclusion allowed business activities associated with operating "Affordable Cremations Inc." except targeted solicitation within 25 miles of the locations. *See* NCA, ¶ 4.

In 1999, Brad had changed the name of an existing corporation that he and Glenda owned to Affordable, Inc., and it began using the name Affordable Cremations or Affordable Cremation Service to operate a business that primarily provided cremations.[7] When Chris joined his parents, he worked in both businesses, WFS and Affordable Cremation Service. After the sale of WFS's assets in 2014, Brad and Glenda planned to continue operating Affordable Cremation Service from its location in Elk City while completing a building in Oklahoma City. The parties negotiated the written exclusion in the purchase agreement and the NCAs to permit this continued business activity within the restricted area.[8]

In 2017, Affordable, Inc. sold all its business assets – described as "a funeral home business at 10900 N. Eastern, Oklahoma City, Oklahoma" – to Shain Family, LLC,

---

[7] There is no evidence that Affordable, Inc. filed a trade name report with the Oklahoma Secretary of State to use a different name. *See* Okla. Stat. tit. 18, § 1140 (corporation doing business in Oklahoma "under any name other than its legal name shall file a report with the Secretary of State setting forth . . . the trade name under which the business is carried on [and] a brief description of the kind of business transacted under the name"). However, the parties agree that Affordable, Inc. was doing business under these names.

[8] Also, after the sale of WFS's assets, Affordable, Inc. acquired in December 2014 Community Funeral Home, LLC, which owned a funeral home in Guthrie. This fact is not relevant to the issues in this case, except to show that Affordable, Inc. continued to own or operate a funeral home business after the sale of WFS to Premier.

including its customer relationships, records, and "[i]ncidental rights to the name 'Affordable Cremation Services,' any other trade names used by [Affordable, Inc.] in operation of the Business, and any variations thereof, for the purpose of business continuity." *See* Premier's Mot. Summ. J., Ex. 8 [Doc. No. 67-1] at 1 and 2, § 1.01(g).[9] Following this sale, Affordable, Inc. remained a corporation with no operating assets.

After Premier purchased WFS's business, Chris worked for Premier in the same job position he had performed for WFS before the sale. During his employment, he received both a salary and the quarterly payments provided by his NCA. Premier terminated his employment on December 16, 2019. Chris then began to question the validity of his NCA and stopped cashing the checks. Also, after an introduction from Brad, Chris met with a member of Shain Family, LLC to discuss Chris's plan to start a funeral home business and use the name, Affordable Cremation Service–West. In January 2020, Brad and Glenda transferred all but nine percent of their stock in Affordable, Inc. (each retaining 4½ percent) to Chris and his wife, Kaylynn Whinery. Brad and Glenda also resigned as officers and directors of Affordable, Inc., and Chris and Kaylynn replaced them as president and secretary, respectively. Also in January 2020, Affordable, Inc. filed a trade name report to do business as Affordable Cremation Service–West, supported by consent from Shain Family, LLC d/b/a Affordable Cremation Services. *See supra* note 7 (regarding trade name report under Okla. Stat. tit. 18, § 1140).

---

[9] This transaction included a contemporaneous agreement between Affordable, Inc. and Shain Family, LLC to purchase the Community Funeral Home in Guthrie. *See supra* note 8.

Affordable, Inc. opened a funeral home in Elk City in February 2020 using the new name, Affordable Cremation Service–West, and employing individuals who had worked for Premier before Chris's termination.  Brad and Glenda provided commercial guarantees for Affordable, Inc. to borrow money for the funeral home.  In both website content and printed advertising, Affordable Cremation Service–West has relied on the Whinery family's history of providing funeral services in western Oklahoma and Chris's involvement in the family business.  In 2020, Affordable Cremation Service–West sent mailers to residents in certain zip codes based on demographic data.  Otherwise, it has engaged in general internet and newspaper advertising using Chris's credentials and likeness under the heading, "A New Funeral Home with Familiar Faces."  *See* Premier's Mot. Summ. J. Against Chris Whinery, Ex. 26 [Doc. No. 64-26].

During the one-year period after Affordable Cremation Service–West opened, Premier suffered a loss of business in the Elk City area.  Premier experienced a significant decrease in its market share among Elk City funeral homes and an unusual number of transfers of preneed contracts or policies from WFS or Premier to Affordable Cremation Service–West.[10]  A preneed burial contract makes all necessary arrangements for services that will follow an individual's death; it is made in advance of death and usually funded by an insurance policy owned by the purchaser.  A funeral home or business is designated at

---

[10] The Whinerys object to these facts on the ground they are "not supported by admissible evidence."  *See* Joint Resp. Br. [Doc. No. 72] at 16, 21; Pl.'s Resp. Br. [Doc. No. 74] at 17.  In support of this objection, the Whinerys argue that certain opinions of Plaintiff's expert, Frank Rosenacker, are inadmissible because his expert report "would or will fail to survive a *Daubert* challenge."  *Id.* at 23.  However, the factual information provided in Mr. Rosenacker's declaration [Doc. Nos. 64-21, 73-1, 75-9] is undisputed.

the time of purchase, and the designated business usually provides the pre-purchased services after the death occurs.   However, a preneed contract or policy is freely transferrable by the individual, or the individual's family after death, to any funeral home or business selected at that time.   The insured under a preneed policy is not considered an established customer of any funeral service business until the death has occurred.

## Discussion

## I.     Enforceability of the NCA

Oklahoma law, which expressly controls the NCAs, has statutory rules governing noncompetition agreements.   Unreasonable restraints of trade are prohibited, but specific exceptions are authorized.   *See* Okla. Stat. tit. 15, § 217 ("Every contract by which any one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by Sections 218 and 219 of this title, or otherwise than as provided by Section 2 of this act, is to that extent void."); *see also Bayly, Martin & Fay, Inc. v. Pickard,* 1989 OK 122, ¶ 12, 780 P.2d 1168, 1172 ("Section 217 prohibits only unreasonable restraints on the exercise of a lawful profession, trade, or business."); *Crown Paint Co. v. Bankston,* 1981 OK 104, ¶ 23, 640 P.2d 948, 952 (same).   Chris claims his NCA is unenforceable as an unreasonable restraint of trade and an unlawful restriction of a former employee prohibited by § 219A.   Premier invokes the exception provided by § 218 for an agreement made when selling the goodwill of a business.[11]   This statute provides:

_____

[11]   Premier also contends the NCA does not impose an unreasonable restraint in violation of § 217.   However, if the statutory exception of § 218 applies, the Court need not reach § 217. *See Oliver v. Omnicare, Inc.,* 2004 OK CIV APP 93, ¶ 9, 103 P.3d 626, 629 ("As § 217 and its exceptions have been applied by the Supreme Court, if the facts raise the issue of the applicability

One who sells the goodwill of a business may agree with the buyer to refrain from carrying on a similar business within a specified county and any county or counties contiguous thereto, or a specified city or town or any part thereof, so long as the buyer, or any person deriving title to the goodwill from him carries on a like business therein.  Provided, that any such agreement which is otherwise lawful but which exceeds the territorial limitations specified by this section may be deemed valid, but only within the county comprising the primary place of the conduct of the subject business and within any counties contiguous thereto.

Okla. Stat. tit. 15, § 218.  "The goodwill of a business is the expectation of continued public patronage . . . ."  Okla. Stat. tit. 60, § 315.  Goodwill means "the custom or patronage of an established trade or business; the benefit or advantage of having established a business and secured its patronage by the public."  *Freeling v. Wood*, 1961 OK 113, ¶ 12, 361 P.2d 1061, 1063 (Okla. 1961).  The value of goodwill "results from the probability that old customers will continue to trade with an established concern."  *Id.*

The purpose of § 218 is to protect the buyer's benefit of the bargain in purchasing a business, "that benefit being the right to conduct the business without interference from the individuals who previously conducted that business."  *See Smoot v. B & J Restoration Servs., Inc.*, 2012 OK CIV APP 58, ¶ 12, 279 P.3d 805, 812.  The statute "allow[s] the parties to the transfer of a going business to mutually agree, as a part of the value of the business transferred, that the transferee will be protected from his transferor who might use his previously acquired experience, contacts and expertise to promote his own interests in the same field of business in competition with his transferee."  *Farren v. Autoviable Servs. Inc.*, 1973 OK 4, ¶ 5, 508 P.2d 646, 648 (citation omitted).  The permissible limits of

---

of either § 218 or § 219, that issue must be decided first; if neither exception applies, then and only then does the issue become whether the restraint of trade is void and enforceable under § 217.").

restraints of trade in the sale of a business are "fixed by statutes which declare such agreements void only as to an excess of time or space." *Berry & Berry Acquisitions, LLC v. BFN Props. LLC*, 2018 OK 27, ¶ 16, 416 P.3d 1061, 1069 (quoting *Wesley v. Chandler*, 1931 OK 477, 3 P.2d 720, 720 (syllabus)).

In this case, there is no real question that the NCAs with Premier were part of its purchase of WFS's assets and the goodwill of the company, and thus, they are authorized by statute.  No challenge is made to the restraints as excessive in time or space.  Instead, Chris asserts that § 218 does not apply to him because he was not a shareholder or owner of WFS and "he had no business goodwill to sell to Premier."  *See* Pl.'s Mot. Summ. J. at 7-8; *see also* Pl.'s Reply Br. at 2, 3 (Chris "was not the transferor" of assets and "had nothing to sale [sic]").  Chris contends his only connection to WFS's sale of its assets is that he became an employee of Premier, and the statute regarding restrictions on employees does not permit the broad covenants in the NCA.  *See* Pl.'s Mot. Summ. J. at 10-13 (discussing Okla. Stat. tit. 15, § 219A); Pl.'s Reply Br. at 2-3.

Upon consideration, the Court rejects Chris's reading of § 218 to mean that an individual must own a legal interest in the assets of a corporation to have a sufficient interest in the goodwill of the corporation's business to support a noncompetition agreement executed in connection with the sale.  The Oklahoma Supreme Court has held that "the owner of an appreciable interest in the stock and property and assets of a corporation has a proportionate interest in the good will of the business; and that on a sale thereof such owner is bound by a contemporaneous agreement, supported by an adequate consideration, not to engage in a similar business" within the limits set by § 218.  *See Key*

*v. Perkins*, 1935 OK 142, ¶ 14, 46 P.2d 530, 532.[12]  In *Griffin v. Hunt*, 1954 OK 87, 268

P.2d 874, the supreme court also held that § 218 applied to the sale of a veterinary practice

by heirs of the former owner/veterinarian and supported the execution of a covenant not to

practice veterinary medicine within the same county by a veterinarian who owned no

interest in the practice.  The court reasoned:

> Plaintiff did not simply buy buildings, equipment and instruments.  Instead,
> he sought to and did buy a going business, along with its good will.  The
> defendant, Dr. Griffin, was the one who was operating the business and had
> developed the good will.  Plaintiff made it plain that he was not interested in
> acquiring the hospital and the facilities without having a binding covenant
> from the defendant that he would not engage in the practice in that county
> for a period of five years.

*Id*. ¶ 8, 268 P.2d at 876.  Under those circumstances, the nonowner who had operated the

business and developed the goodwill could execute a § 218 noncompetition agreement

when the goodwill was sold, regardless of ownership or legal title to the business.  *Id*.; *see*

*Oliver v. Omnicare, Inc*., 2004 OK CIV APP 93, ¶ 10, 103 P.3d 626, 629-30 (disputed facts

regarding plaintiff's ownership or development of goodwill in three businesses that were

sold when he executed an employment agreement with the purchaser, prevented summary

adjudication of § 218's applicability to a noncompete provision).

It is undisputed that Brad and Glenda owned WFS, the corporation that sold the

Whinery funeral home business to Premier, and the validity of their NCA under § 218 is

unquestioned.  Under *Griffin*, Premier could also obtain valid NCAs from other persons

who had developed the goodwill of WFS's business.  Although only Brad signed the

---

[12]  However, a "miniscule amount of stock" in a corporation (0.8%) may be insufficient to apply § 218.  *See Bayly*, 1989 OK 122, ¶ 9, 780 P.2d at 1170.

purchase agreement on behalf of WFS, the agreement required other individuals to execute

an NCA as a condition of Premier's acquisition of the business.  The purchase agreement

contains an unambiguous provision regarding collateral agreements that shows a

noncompetition agreement from WFS was part of the bargain that Premier struck in

acquiring its assets and goodwill, and four individuals are identified by name as persons

who would be required to execute the agreements.

Section 6.1 of the purchase agreement states in pertinent part:

Each of the various instruments and agreements contemplated by this Agreement shall be duly executed and delivered on the Closing Date by the parties indicated therein, and shall contain such provisions and be in such form as the parties thereto shall, by their execution thereof, approve.  The closing of this transaction is explicitly conditioned upon the simultaneous closing and execution of the following documents and agreements, each of which shall be in form satisfactory to Seller:

(a) Non-Competition / Non-Solicitation Agreement.   Seller shall have executed a Non-Competition/ Non-Solicitation Agreement with PREMIER FUNERAL MANAGEMENT GROUP IV, LLC which agreement shall cover a twelve (12) year period following the closing covering an area within a thirty (30) mile radius of Business location.  Seven Hundred Fifty Thousand Dollars ($750,000) of the Purchase Price shall be allocated to the Non-Competition Agreement between Seller and Premier Funeral Management Group IV, LLC.

PURCHASER ACKNOWLEDGES THAT R. BRAD WHINERY, GLENDA F. WHINERY, CHRIS WHINERY, AND CARL BILLEY OWN A BUSINESS KNOWN AS AFFORDABLE CREMATIONS INC., AN OKLAHOMA CORPORATION WHICH PROVIDES BUSINESS SERVICES THROUGHOUT THE STATE OF OKLAHOMA.  IT IS FURTHER UNDERSTOOD AND AGREED BETWEEN THE PARTIES THAT THIS AGREEMENT DOES NOT COVER ANY ASSETS OF AFFORDABLE CREMATIONS INC., AND THAT AFFORDABLE CREMATIONS INC. SHALL REMAIN THE SOLE AND SEPARATE PROPERTY OF R. BRAD WHINERY, GLENDA F. WHINERY, CHRIS WHINERY, AND CARL BILLEY.  IT IS FURTHER UNDERSTOOD AND AGREED THAT THE NON-COMPETITION AGREEMENTS

<u>ASSOCIATED WITH THIS ASSET PURCHASE AGREEMENT AND
EXECUTED BY R. BRAD WHINERY, GLENDA F. WHINERY, CHRIS
WHINERY, AND CARL BILLEY SHALL NOT COVER ANY BUSINESS
ACTIVITIES ASSOCIATED WITH AFFORDABLE CREMATIONS INC.</u>
EXCEPT THAT AFFORDABLE CREMATIONS INC. SHALL NOT DO
ANY TARGETED SOLICITATION (TARGETED SOLICITATION
SHALL NOT INCLUDE BROAD ADVERTISING MEANS SUCH AS:
TELEVISION, NEWSPAPER, PHONEBOOKS, OR INTERNET) OF ANY
BUSINESS     INCLUDING     ANY     FORMER,     EXISTING     OR
PROSPECTIVE CUSTOMER OR CLIENT IN AN AREA WITHIN 25
MILES OF THE THOSE [SIC] BUSINESSES IN LAWTON, ELK CITY,
SAYRE, ERICK, AND CHEYENNE OKLAHOMA.

Premier's Mot. Summ. J. Chris Whinery, Ex. 4 [Doc. No. 64-4] and Countercl. Defs.' Mot.

Summ. J., Ex. 5 [Doc. No. 66-5], Asset Purchase Agreement at 19-20 (emphasis added).

Similarly, the NCAs expressly show their connection to the transaction by which

Premier purchased WFS's funeral home business. Each NCA denominates Premier as the

"Purchaser" in the acquisition WFS's assets and recites that the NCA was "an expressed

requirement under the Purchase Agreement," that it was "a major inducement for Purchaser

to acquire" WFS's business, and that it was "necessary for protection of the Business." *See*

NCA at 1 and ¶ 2. By the NCAs, Brad, Glenda, and Chris specifically agreed that during

the term of the agreement, except for services rendered to Premier or its affiliates, they

would not "directly or indirectly, alone or for the account of any other person:"

(a) In any capacity (either as employee, employer, consultant, agent,
principal, partner, trustee, advisor, officer, director, shareholder . . . or in any
other individual or representative capacity) <u>be connected in any manner</u>
(whether to own, manage, control, advise, support, finance, operate, engage
or participate in the ownership, management, operation or control of) <u>with
any entity</u> (business partnership, joint venture, corporation, trust or any other
profit or not-for-profit business or organization) <u>which is or may be in
competition with the funeral home, mortuary, monument, crematory,
cemetery, burial or preneed marketing business of the Business within a fifty
(50) mile radius of Whinery's Lawton, Elk City, Sayre, Erick, and Cheyenne,</u>

> Oklahoma funeral home location as existing at the time of Closing (the "Restricted Territory"); or
>
> (b) Within the Restricted Territory, interfere with, solicit, disrupt or attempt to disrupt any past, present or prospective relationship, contractual or otherwise, between the Business and any former, existing or prospective customer, client, supplier, employee or agent or request or advise any such person to withdraw, curtail or cancel their business with the Business or induce or attempt to induce any such person to breach their agreements with the Business.

NCA, ¶ 2 (emphasis added).  The Whinerys agreed they would "not knowingly damage the goodwill of the Business, or adversely affect the relationships of the Business with its suppliers, employees, client families or other third parties" nor "knowingly take any action which could reasonably be expected to cause material adverse harm to the Business."  *See id.* ¶ 3.  The NCAs contained an all-capitalized provision like the one in the purchase agreement as a separate paragraph titled, "Exclusion From Covenant."  *See id.* ¶ 4.

From the undisputed facts, the Court finds that Premier purchased the goodwill of WFS and to protect its bargain required WFS's owners and key employees to execute NCAs that prevented them from using their experience and contacts in the communities to compete with Premier's ongoing operation of their former business.  Premier both included a noncompetition provision in the purchase agreement and required Brad, Glenda, and Chris to provide NCAs in exchange for specific consideration.[13]  Ancillary to the purchase

---

[13]  Each NCA contained a "Consideration" provision in paragraph 6.  Chris's NCA stated:

In consideration of and for Whinery's agreement contained herein, including his agreement not to compete during the Term of this Agreement, Whinery shall be paid the sum of One Hundred Fifty Thousand Dollars ($150,000.00) payable as follows:  Quarterly payments of $3,125.00 shall begin on the 3rd day in the twenty-fifth (25th) month subsequent to Closing (this represents the 2 year stand-by

agreement, Brad, Glenda, and Chris each agreed they would not compete with Premier's continuation of the business in the manner prohibited by the NCAs, except as expressly permitted by the exclusion.

The substantial issue presented is whether Chris's NCA was authorized by § 218 even though he lacked an ownership interest in WFS, based on his part in operating WFS's funeral home business and developing the goodwill of the business. The undisputed facts material to this issue are that Chris was a licensed funeral home director who had actively worked in WFS's business for approximately ten years before the sale. Chris described his role as a "general manager" of the business. *See* Pet. [Doc. No. 1-2], ¶ 7. His parents had owned and operated WFS for more than twenty years; his extended family had owned and operated funeral homes in the area for decades; and the business used their family name, Whinery Funeral Services. Premier made clear that a condition of purchasing WFS's business was a binding covenant from Chris that he would not engage in a competing funeral home business in the communities served by WFS. On these facts, the Court finds that Chris's role in operating and developing the goodwill of WFS's business was such that § 218 applies to the noncompetition agreement that Chris gave to Premier as part of the purchase transaction.

For these reasons, the Court finds that the NCAs are enforceable under § 218 against Brad, Glenda, and Chris, subject to the statutory conditions.

---

provision set-forth by the Lender), and such amount shall be due and payable on the 3rd day of each quarter thereafter until $150,000.00 is fully paid.

Chris Whinery's NCA, ¶ 6 [Doc. Nos.1-3, 63-1, 64-6].

II.   **Breach of the NCA**

Having found that the NCAs fall within § 218, the covenants not to compete are enforceable according to their terms. *See Berry*, 2018 OK 27, ¶ 16, 416 P.3d at 1069 ("We have consistently upheld non-compete agreements to protect business goodwill pursuant to § 218.") (footnote omitted, citing cases).[14]   Thus, unless the Whinerys' conduct is protected by the negotiated exclusion, Chris, Brad and Glenda have engaged in prohibited conduct by owning interests in Affordable, Inc., which is operating a competing funeral home in Elk City.[15]   Each NCA contains a provision titled, "Exclusion From Covenant," which states:

> PURCHASER ACKNOWLEDGES THAT WHINERY OWNS AN INTEREST IN A BUSINESS KNOWN AS AFFORDABLE CREMATIONS INC., AN OKLAHOMA CORPORATION WHICH IS A BUSINESS THAT PROVIDES CREMATION SERVICES THROUGHOUT THE STATE OF OKLAHOMA.  IT IS UNDERSTOOD AND AGREED BETWEEN THE PARTIES THAT THE ASSET PURCHASE AGREEMENT ENTERED INTO BETWEEN THE PARTIES DOES NOT COVER ANY ASSETS OF AFFORDABLE CREMATIONS INC. AND THAT AFFORDABLE CREMATIONS INC. SHALL REMAIN THE SOLE AND SEPARATE PROPERTY OF R. BRAD WHINERY AND GLENDA F. WHINERY.  <u>IT IS FURTHER UNDERSTOOD AND AGREED THAT THIS NONCOMPETITION AGREEMENT SHALL NOT COVER ANY BUSINESS ACTIVITIES PERFORMED BY WHINERY ASSOCIATED WITH OWNING AND OPERATING AFFORDABLE CREMATIONS INC., EXCEPT THAT AFFORDABLE CREMATIONS INC. SHALL NOT DO ANY TARGETED SOLICITATION</u> (TARGETED SOLICITATION SHALL NOT INCLUDE BROAD ADVERTISING MEANS SUCH AS: TELEVISION, NEWSPAPER, PHONEBOOKS, OR

---

[14]   A non-solicitation agreement that is ancillary to and complements a non-competition agreement is enforceable as well. *See id.* ¶ 18, 416 P.3d at 1070.

[15]   The undisputed facts stated by Brad and Glenda in their Motion concede they have not engaged in conduct prohibited by ¶ 2(a) of the NCA "[w]ith the exception of [their] involvement in Affordable, Inc." *See* Countercl. Defs.' Combined Mot. Summ. J. at 11-12, ¶¶ 27-28.

INTERNET) OF ANY BUSINESS INCLUDING ANY FORMER, EXISTING OR PROSPECTIVE CUSTOMER OR CLIENT IN AN AREA WITHIN 25 MILES OF THE THOSE [SIC] BUSINESSES IN LAWTON, ELK CITY, SAYRE, ERICK, AND CHEYENNE OKLAHOMA.

NCA, ¶ 4 (emphasis added).

The purchase agreement and the NCAs refer to the excepted business as "Affordable Cremations Inc.," rather than its legal name Affordable, Inc. doing business as Affordable Cremations or Affordable Cremation Service. However, the parties do not contend this discrepancy creates any ambiguity in the contracts. The Court agrees that the NCAs are unambiguous in meaning that Brad, Glenda, and Chris could continue to operate the business of Affordable, Inc. known as Affordable Cremations or Affordable Cremation Service without violating the covenants in the NCAs. The question becomes whether the nature of the excluded business was limited, as argued by Premier, to cremation services rather than a funeral service business.

Upon consideration, the Court finds no such limitation in the text of the parties' agreements and no ambiguity in this regard. "Generally, the terms of the parties' contract, if unambiguous, clear, and consistent, are accepted in their plain and ordinary sense." *Smoot*, 2012 OK CIV APP 58, ¶ 8, 279 P.3d 805, 811(quoting *Osprey v. Kelly-Moore Paint Co. Inc*., 1999 OK 50, ¶ 13, 984 P.2d 194, 198). Premier asks the Court to draw a "cremation services only" limit from language of the NCA that identifies the excepted business as "Affordable Cremations Inc. . . . which is a business that provides cremation services throughout the State of Oklahoma." *See* Premier Mot. Summ. J. Chris Whinery at 25 (quoting NCA, ¶ 4 (without capitalization)); Premier Mot. Summ. J. Brad and Glenda

Whinery at 25 (same); *see also* Premier's Resp. Brs. [Doc. No. 73] at 15-16, 18 and [Doc. No. 75] at 13.  The descriptive phrase on which Premier relies does not say the corporation provided only cremation services or limited its business to such services.  More importantly, the quoted language does not purport to define the scope of the exclusion or to limit the permissible business.  To the contrary, the NCA contains broad language stating it "shall not cover any business activities performed by Whinery associated with owning and operating Affordable Cremations Inc." except targeted solicitation.  *See* NCA, ¶ 4.

The Court finds that the exclusion included in the NCAs allowed Brad, Glenda, and Chris to continue operating Affordable, Inc.'s business within the restricted territory and imposed no limitation on its business activities except targeted solicitation (as defined in the exclusion).  However, reaching this conclusion does not end the inquiry.  Premier asserts that Affordable, Inc. did not continue operating the excepted business but, instead, sold the assets and goodwill of the business three years later, stopped doing business as Affordable Cremations or Affordable Cremation Service, and transferred all rights to those trade names to the purchaser, Shain Family, LLC.  It appears from the record that Affordable, Inc. operated no business at all for more than two years and then transferred all but nine percent of the corporation to new owners, who began a business using a similar name to Affordable Cremation Service.  Premier contends "[t]he exclusion is not revived simply because Affordable, Inc. later formed a new business entity and contracted with Shain Family, LLC to use the tradename 'Affordable Cremation Service–West.'"  *See* Premier Resp. Brs. [Doc. No. 73] at 19 and [Doc. No. 75] at 14.

Upon consideration, the Court cannot find in the NCAs or the purchase agreement any clear indication of how the exclusion for Affordable, Inc. doing business as Affordable Cremations or Affordable Cremation Service should be applied under these circumstances. As a legal matter, the parties seem to agree that their agreements are unique in creating an exception to a noncompetition agreement "with specific carveouts for future competition." *See* Countercl. Defs.' Combined Mot. Summ. J. at 20; Premier's Resp. Br. at 16 ("Premier concedes that . . . Affordable Cremations, Inc. was exempt from the NCA" but disputes "the scope of the exemption").[16]  Although the exclusion may be unprecedented, Oklahoma law does recognize that enforcement of a noncompetition agreement given to protect a sale of goodwill of a business under § 218 depends on the purchaser's continued operation of the business. *See Bayly,* 1989 OK 122, ¶ 13 n.11, 780 P.2d 1168, 1173 n.11 ("Section 218 allows parties selling good will to agree not to compete within a specified county or city for as long as the purchaser carries on a similar business."); Okla. Stat. tit. 15, § 218 (allowing restraint "so long as the buyer . . . carries on a like business").  By analogy, an agreement to exclude a particular business of the seller from a § 218 noncompetition agreement may depend on the seller's continued operation of the excluded business.

Premier asserts that the excluded business no longer exists because Affordable, Inc. ceased doing business as Affordable Cremation Service when it sold that business in 2017.

---

[16]   In reported cases where the seller has retained one business while selling the goodwill of a similar business, the noncompetition agreement has expressly stated that the retained business would not compete with the ongoing business of the purchaser.  *See, e.g.*, *Berry*, 2018 OK 27, ¶ 8, 416 P.3d at 1066 ("noncompete allowed the [sellers] to continue to own and operate [three nursery businesses] so long as such entities did not compete with" the purchased nursery business).

The Whinerys suggest that what Affordable, Inc. sold to Shain Family, LLC was a business in Oklahoma City that is different from the business in Elk City covered by the exclusion. *See* Countercl. Defs.' Reply Br. [Doc. No. 76] at 6 ("Affordable, Inc. sold to Shain its specific location in Oklahoma City"). Few facts and little evidence are presented concerning the nature of Affordable, Inc.'s excepted business, its continued operation after the sale to Premier, and the 2017 sale of its assets.[17] All parties seek to draw conclusions from parole evidence regarding what WFS and Premier discussed and understood when the purchase agreement was made.

On the existing record, the Court finds that genuine disputes of material facts prevent a determination as a matter of law that Affordable, Inc. doing business as Affordable Cremation Service–West is covered by the exclusion of the NCAs and the purchase agreement. Thus, the Court cannot determine as a matter of law at this time whether the NCAs have been breached by Affordable, Inc.'s current operation of a business that directly competes with the business purchased by Premier. Therefore, no party has shown they are entitled to summary judgment on a claim or counterclaim regarding the NCAs.

## III.    Interference with Business Relationship or Prospective Business Advantage

The Oklahoma Supreme Court recently revisited the common law tort of intentional interference with a contractual or business relationship and examined in "a case of first

---

[17] For example, Brad testified in his deposition that Affordable, Inc. was "a licensed funeral establishment" and suggested in his testimony that this remained true before and after the sale to Premier. *See* Brad Whinery Dep. 99:10-100:15. However, no license information is presented.

impression" the elements of the tort of intentional interference with a prospective business advantage. *See Loven v. Church Mut. Ins. Co*., 2019 OK 68, ¶ 18, 452 P.3d 418, 423-24. The elements of tortious interference with a current business relationship are: [18]

> 1.) interference with a business or contractual right;
>
> 2.) malice or wrongful interference that is neither justified, privileged, nor excusable; and
>
> 3.) damage proximately sustained as a result of the interference.

*Id*. ¶ 18, 452 P.3d at 424 (citing *Tuffy's Inc. v. City of Okla. City*, 2009 OK 4, ¶ 14, 212 P.3d 1158) (footnote omitted). "[T]he element of malice, for malicious interference, is defined as an unreasonable and wrongful act done intentionally, without just cause or excuse and . . . it clearly requires a showing of bad faith." *Id*. ¶ 19, 452 P.2d at 425. "[T]he essential elements of a claim for intentional interference with a prospective economic advantage [are] as follows:"

> 1.) the existence of a valid business relation or expectancy;
>
> 2.) knowledge of the relationship or expectance on the part of the interferer;
>
> 3.) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and
>
> 4.) resultant damage to the party whose relationship has been disrupted.

*Id*. ¶ 21, 452 P.3d at 425 (footnote omitted). As to the third element, the supreme court stated:

---

[18]    "[T]he terms 'malicious interference,' 'intentional interference,' and 'tortious interference' with contract and business relations . . . constitute the same tort in Oklahoma jurisprudence." *Id*. ¶ 19, 452 P.3d at 425 (footnote omitted).

> [L]ike the tort of current or present business interference in *Tuffy's*, supra, the element of intentional interference clearly requires a showing of bad faith. The interference must be the purpose of the tortfeasor's act, and their motive must include a desire to interfere and disrupt the others' prospective economic business advantage.

*Id*. ¶ 21, 452 P.3d at 425-26 (footnotes omitted). Without evidence that the alleged tortfeasor "acted with the intentional purpose to interfere or in bad faith" or "that any interference was done with an improper, wrongful, or malicious motive," the claim fails. *Id*. ¶ 22, 452 P.3d at 426.

In this case, Premier provides no facts or evidence to support its claim that Chris, Brad, and Glenda intentionally interfered with Premier's existing or prospective business relationships with a third party and acted in bad faith or with a malicious motive. Premier points to conduct by Chris and Brad related to starting and promoting a competing funeral business in Elk City, Affordable Cremation Service–West, and presents evidence that Premier has experienced a drop in business generally and a loss of business from preneed funeral contracts or insurance policies specifically. Premier concedes, however, that preneed contracts do not bind the individuals, or family members after their deaths, to use a particular funeral home or service and the contracts are freely transferable. The only expectancy arises from evidence that a change in funeral homes typically does not occur. However, even if one is willing to infer that Chris, Brad, or Glenda caused this change in the use of Premier's funeral home, Premier does not identify any material facts tending to show that Chris, Brad, or Glenda acted in bad faith or with malice.

In short, on the record presented, the Court finds that Premier has failed to demonstrate a genuine dispute of material fact regarding its tort theory of liability and that

Chris, Brad, and Glenda are entitled to summary judgment on Premier's claim of tortious interference with existing or prospective business relationships.

## Conclusion

For these reasons, the Court finds that genuine disputes of material facts prevent summary judgment on Plaintiff Chris Whinery's claim for a declaration that his noncompetition agreement is unenforceable and Defendant Premier's counterclaim that Chris, Brad and Glenda have breached their noncompetition agreements by owning or operating Affordable, Inc. doing business as Affordable Cremation Services–West. The Court further finds, however, that the Whinerys are entitled to summary judgment on Premier's counterclaim for tortious interference with contractual and prospective business relations.

**IT IS THEREFORE ORDERED** that Plaintiff Chris Whinery's Motion for Summary Judgment [Doc. No. 63] and Counterclaim Defendants Brad Whinery and Glenda Whinery's Combined Motion for Summary Judgment [Doc. No. 66] are **GRANTED** in part and **DENIED** in part, and Defendant Premier Funeral Management Group IV, LLC's Motions for Summary Judgment [Doc. Nos. 64 and 65] are **DENIED**.

**IT IS SO ORDERED** this 26th day of September, 2022.

_____
TIMOTHY D. DeGIUSTI
Chief United States District Judge

24